In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 18-1954

JEREMIAH FELTON,

*Petitioner-Appellant,*

*v.*

BRYAN BARTOW,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 14-cv-965 — **Nancy Joseph**, *Magistrate Judge.*

———————————

ARGUED FEBRUARY 22, 2019 — DECIDED JUNE 18, 2019

———————————

Before RIPPLE, MANION, and BRENNAN, *Circuit Judges.*

MANION, *Circuit Judge.* A jury convicted Jeremiah Felton of
first degree intentional homicide in Wisconsin state court for
the death of his three-month-old son, Jeremiah Felton Jr. (J.J.).
The jury heard testimony about the days leading up to J.J.'s
death, such as those who cared for and had contact with him,
including Felton. The jury also heard about Felton's conver-
sations with police, whom he told that J.J. had slipped and hit
his head in the bathtub, and with fellow jail inmate, Douglas

House, who testified that Felton said he had swung J.J. into a bathroom door. J.J.'s treating physicians and the medical examiner also testified about J.J.'s injuries and cause of death, which two of the physicians stated, in part, was due to shaking. The medical examiner concluded that blunt force trauma was the cause of death. The jury found Felton guilty.

Felton sought post-conviction relief in the Wisconsin state court based on ineffective assistance of counsel. In particular, Felton cited his attorney's failure to object to the prosecutor's statement during closing argument that House could not receive a sentence modification for his testimony in Felton's trial and failure to secure medical expert testimony to rebut the State's witnesses. At the post-conviction hearing, Felton's counsel testified as well as three medical experts who concluded J.J. had not been shaken and J.J.'s injuries were consistent with a fall of two to four feet. The state trial court denied Felton's petition, and the Wisconsin Court of Appeals affirmed the denial. The Wisconsin Supreme Court summarily denied Felton's petition for review. Felton sought a writ of habeas corpus under 28 U.S.C. § 2254 in the district court. The district court denied Felton's petition, and Felton now appeals to this court. Because the decision of the Wisconsin Court of Appeals was not unreasonable, Felton's petition is denied.

I.

A. Criminal Trial[1]

J.J. Felton was born on February 16, 2008. During his short life, J.J. lived with his mother, Sasha Fulton, and his father,

---

[1] Unless otherwise noted, the facts are drawn from the testimony and other evidence at Felton's criminal jury trial.

Jeremiah Felton, would sometimes stay with them. Sasha and Felton were not married. They had renewed their relationship in June 2008, and Felton moved with Sasha and J.J. to a new apartment the weekend before J.J. died. On Sunday, June 1, 2008, J.J. spent the day at the park with various family members, including his parents. Sasha took J.J. home around suppertime while Felton stayed out until after midnight. That night, Felton stayed with Sasha and J.J. at the new apartment. Sasha's cousin, Bryiana Fulton, and her baby also stayed there that night.

1. The Day at the Apartment

The next morning, while Felton slept, Sasha fed and played with J.J. before going to work shortly before 9 a.m. Bryiana sometimes cared for J.J., but that day, Sasha told her to leave him with Felton. It was the first time Sasha left J.J. in Felton's care for the day while she was at work.

While Felton was home with J.J., different family members came in and out of the apartment throughout the day. Bryiana left the apartment sometime after 9 a.m. When she returned around noon, Felton and J.J. were there along with Byrian Fulton (Bryiana's brother) and Casey Fulton (Sasha's brother). J.J. seemed to be acting normally at that time. Bryiana gave him a bottle before leaving around 12:30 p.m. Casey and Byrian left at the same time, and Felton remained in the apartment with J.J. Sasha called Felton from work about 2:30 or 3 p.m., and he told her that J.J. had been sleeping all day.

Sasha's fifteen-year-old cousin, Anthony Hendrix, came by the apartment sometime after his school let out for the day at 2:30 p.m. There he found Felton alone in the apartment with J.J., who was sleeping on the couch while Felton was getting

out of the shower. Hendrix testified that J.J. cried multiple times while he was there, and that both he and Felton picked him up. Hendrix put J.J. down in his crib and patted his back. J.J. stopped crying, and Hendrix left soon after.

When Sasha returned home from work around 5:25 p.m., she checked on J.J., who was sleeping. She let him sleep; J.J. was a fussy baby, and Sasha did not want to disturb him. Bryiana came back around the same time. Felton asked Sasha to drive him to his friend's graduation. After eating a sandwich, Sasha borrowed Bryiana's car to drive Felton to the graduation ceremony and returned about a half hour to forty minutes later. While Sasha and Felton were gone, Bryiana stayed at Sasha's apartment with her son and J.J. When Sasha returned, she did not check on J.J. right away, but let him sleep and began cleaning the kitchen and bathroom. About fifteen minutes later, she heard J.J. make a funny noise and went to check on him. There she found J.J. with one eye open and one eye shut. Sasha cried out that something was wrong. Bryiana thought that Sasha was overreacting until she saw J.J. She then told Sasha to call 911 while she attempted to revive J.J.

2. At the Hospital

J.J. was taken by ambulance to St. Vincent Hospital in Green Bay around 7:30 p.m. Dr. John Taylor, pediatric critical care physician, first saw J.J. shortly after he arrived at the hospital. Dr. Taylor intubated J.J. and ordered x-rays and a CT scan. The CT scan revealed J.J. had a skull fracture just above and slightly behind his right ear, specifically his right parietal bone, bleeding under his skull and in his brain, and retinal hemorrhages. Dr. Taylor told Sasha and Felton he was concerned someone had hurt J.J. because there was no record of a car accident or someone falling or tripping down the stairs

with their son, and J.J. was not yet rolling or moving by himself. Sasha told Dr. Taylor that the day before while she had been carrying J.J. in her left arm, J.J. bumped his head as she walked through the door. Felton did not give any explanation to Dr. Taylor.

A number of family members came to the hospital that night. Some of them played in the halls, including Felton, who pushed Casey around in a wheelchair. Hospital staff asked them to leave because they were too noisy and disruptive. Felton and Sasha were allowed to stay, and they fell asleep in the family waiting room.

That same night, the hospital or Brown County Human Services contacted the police about J.J.'s serious injuries and the lack of explanation for them. Detective Robert Haglund and Detective Walter Wickman of the Green Bay Police Department arrived at the hospital around 3 a.m. on Tuesday, June 3. Haglund woke Felton and Sasha. He interviewed Sasha with a human services representative present, and Wickman interviewed Felton in a separate room. There Felton told Wickman that he did not know what could have happened because J.J. was with him or people they knew. He told Wickman about Sasha bumping J.J.'s head into the door, but provided no other explanation about how J.J. might have sustained his injuries. After interviewing Sasha, Haglund joined Wickman and Felton and asked Felton what had happened. After confirming Felton told him the same thing he had just told Wickman, Haglund and Wickman left the hospital.

Haglund returned to the hospital the next day and spoke with various family members, including Bryiana and Hendrix, asking them what might have happened to J.J. He learned about the move to the new apartment on Friday and

Saturday and the day at the park on Sunday. At the end of his interviews, Haglund asked the family, including Felton, Sasha, and Bryiana, to be quiet because they were being noisy playing up and down the halls. Haglund also told them he believed one of the family members was responsible for J.J.'s injuries and his prime suspects were Felton, Bryiana, and Sasha because they had been alone with J.J. on Monday. Haglund also advised Felton to check in with his probation officer as he was required to do if he spoke with law enforcement.

While at the hospital, Felton stated more than once, "I just don't want to go to jail." In one instance, Bryiana testified Felton expressed frustration over what he thought was a lack of information from doctors, and he did not want to hit the doctor and go to jail.

3. J.J.'s Death and Felton's Conversation with Police and Fellow Inmate

J.J.'s condition worsened, and he died from his injuries on June 5th. Shortly after his son's death, Felton went to the Brown County Jail on a probation hold. On June 9, 2008, Felton asked to talk with police and spoke with Haglund. Felton gave Haglund a statement, which Haglund typed and Felton read and signed. In that statement, Felton recounted that around 2 p.m. on the day J.J. was rushed to the hospital, "I got in the bathtub with my baby and started giving him a bath. There was only two inches of water. He was sitting between my legs and his butt slipped forward and his head came backwards and his head hit the bottom of the tub between my legs. His right ear went in the water, but his face didn't go under the water. He started crying. I wiped him off, got him dressed, and gave him a bottle, patted him to sleep while he was lying on the couch." Felton told Haglund he felt it in his legs when

J.J. hit the bottom of the tub and J.J. hit the tub "kind of hard." Felton said he was going to tell Haglund about this in the hospital, but Haglund made him nervous.

Haglund spoke again with Felton on June 12th telling him the doctors said that the slip in the tub could not have caused J.J.'s injuries. When Haglund left the interview room, Felton stood by the door trying to listen to what was being said outside the room, which Haglund stated witnesses typically do not do. After speaking with Felton on June 12th, Haglund sent the case file over to the District Attorney's Office recommending Felton be charged with first degree intentional homicide for J.J.'s death. On June 13, 2008, the Green Bay Police Department issued a press release about its request and stated J.J. had suffered a skull fracture from blunt force trauma. The press release did not say where the fracture was located on the skull.

Meanwhile, Douglas House, one of Felton's fellow inmates at the Brown County Jail, sent police a request form, otherwise known as a "kite," dated June 13, 2008. House had nine to ten prior convictions and had a reputation as both a jailhouse lawyer and a snitch. House's kite stated, "I have conclusive evidence to convict Jeremiah Felton, Sr. in the death of his infant son, Junior. That was caused by right side trauma to head behind right ear. Will only come out if called out as an attorney visit."

Haglund spoke with House on June 16th. (It was the not the first time Haglund and House spoke with one another; they had previously talked about other cases.) House told Haglund that when Felton approached him, Felton had not yet been charged with J.J.'s death, and they discussed the time constraints for Felton's probation hold. After that, Felton told

him about J.J. House told Haglund that Felton had told him that J.J. was getting on his nerves, so he swung J.J. into the bathroom door hitting the right side of J.J.'s head behind his ear. House also asked Haglund to look into whether the police were harassing his children.

House spoke again with Haglund on June 23rd. Haglund told House that the police were watching another house near his children. House, in turn, told Haglund that Felton told him that the police questioned him about J.J. and he planned to blame it on his girlfriend's sister. In addition to telling Haglund about Felton, House asked Haglund if he could look into police harassing his son and daughter. Haglund checked into this and later told House that the police were not watching his kids, but were watching a nearby house.

4. Other Criminal Trial Testimony

Felton was charged with first degree intentional homicide in J.J.'s death, and the case proceeded to trial. Several witnesses, including Sasha and Felton's mother, testified that J.J. was a fussy baby. On one occasion, Bryiana "popped" J.J. and her son on their diapers when they were "both a little crabby." Sasha testified that she did not like that Bryiana spanked J.J., but she was very close with her cousin and trusted her to care for J.J. As for Felton, Sasha and others testified that he was good with his children and nieces and nephews, and they also testified that if J.J. got fussy, Felton would pass J.J. to someone else or put him in his car seat until he stopped crying.

House testified at trial:

A. Well, he [Felton] said that he had been home, I believe he said he was home with his girlfriend's sister, or wife's sister, one or the other, and that he was giving

the baby a bath, and the baby slipped. That the baby had either gotten water in his eyes or mouth and started crying, and he tried for a long period of time to quiet the baby down, but that didn't happen.

Q. What else did he continue to tell you what happened?

A. He had gotten frustrated and was holding the baby, and then swung the baby into the bathroom door. The baby, Jeremiah, hit his head on the right side, and he pointed to the left - - or the right side behind his ear of where the baby hit his head.

Q. I was going to ask, how do you know it was the right side?

A. Well, as he was telling me, he made the motion, and he said he was holding the baby, swung the baby, and the baby hit his head, and I said where, and he said right here, and he pointed right behind his head.

…

Q. Did he say anything else to you after - -

A. He did. You know, he made it sound like he was going to put the blame on the - - the girlfriend's sister, and he said he - - he also said you know, for a substantial amount of time that baby shut up so he knew something was wrong.

House found Felton's demeanor odd because "it was like there was no concern whatsoever for the baby." House also told the jury about Felton's confession and identified Felton in the courtroom. He testified that after Felton was charged,

Felton approached House about the kite and asked why House snitched on him.

On cross-examination, House denied ever talking with his attorney about getting anything in return for information he had about Felton. Felton's counsel impeached House by playing two recorded telephone conversations that House had while in the Brown County Jail. The first call was between House and his attorney. During that call, House's attorney told him she had spoken with Haglund who said he was unsure he could do anything for House unless House testified in Felton's case. House's attorney also discussed information House had about another homicide. The second call was between House and one of his daughters. House's daughter told him that Haglund had said House needed to testify "against [sic] for the baby or something." On redirect, House testified his case was over and he did not receive any consideration in his case for his testimony in Felton's trial.

Felton called his Brown County Jail cellmate, Ishtayopi Jones, to testify. Jones came to the jail on June 14th. He was familiar with House because they had met previously, though he tried to stay away from House because his family warned him that House was a "con artist." Jones stated House expressed concern to him when he learned that Jones was rooming with Felton, though House did not tell Jones why. Jones said he learned about Felton's case from the television. Jones stated he did talk with Felton about House and what a "big troublemaker" and "scam artist" he was.

On cross-examination, the prosecutor asked Jones about a kite he signed and dated October 8, 2008. The kite stated, in part, "I did not and will not try and tell on Jeremiah Felton." When asked at trial, "What's there to tell on Jeremiah Felton,"

Jones responded, "Nothing, I guess." The prosecutor further questioned Jones about the kite, and Jones's testimony made it clear that he knew nothing about Felton's case from Felton or House and that Felton, not Jones, wrote the kite. When asked why he signed the request form, Jones responded, "'Cause [Felton] looked pretty mad at me, then I just told him I'd sign it and that if he needs me to testify, I'll do that for him." Jones also testified he told Haglund that Felton had never talked with Felton about his case and that House "is just lying and making stuff up to get himself out of what situation he's in right now."

   5. Medical Testimony

Also at trial, the State called three physicians, two of J.J.'s treating physicians and the medical examiner, to present testimony about J.J.'s injuries and cause of death. Dr. John Taylor, who first treated J.J. upon his arrival at the hospital, testified that both J.J.'s fracture and retinal hemorrhaging were the result of a significant amount of force, such as a car accident. In J.J.'s case, Dr. Taylor suspected "most likely that this was a result of significant shaking." Dr. Taylor stated that a bump like Sasha bumping J.J.'s head in the doorway would not account for J.J.'s injuries because the bump was on J.J.'s left side, the force would have been insufficient, and J.J. was eating, sleeping, awakening, and playing in an age-appropriate way after that. He also testified that it is difficult to establish a time frame for when the injuries were sustained. According to Dr. Taylor, it could be at the longest a day, but he believed it was within an hour or two of the injuries presenting themselves.

A couple hypotheticals were posed to Dr. Taylor while he was testifying. The prosecutor asked him about a child J.J.'s

size slipping in the bathtub between someone else's legs and hitting his head. Dr. Taylor responded that the distance of the fall would not have caused the skull fracture, hemorrhages, and bruising in the back of the eye. He stated that J.J.'s injuries were more consistent with his head being swung into a door than falling in a bathtub. Felton's counsel asked whether, hypothetically, those injuries could have resulted from someone falling with J.J. at the playground. Dr. Taylor responded that it was "[e]xtraordinarily unlikely, but … there was a miniscule possibility."

Another of J.J.'s treating physicians, Dr. Ralph Vardis, also testified. He concluded that J.J.'s injuries were consistent with being violently shaken and slammed into a hard surface. On cross-examination, Dr. Vardis stated that the injuries could have been caused by a fifteen-year-old so long as it was violent and intentional. Dr. Vardis testified about the progression of J.J.'s symptoms, namely the brain swelling, and concluded that J.J. was so severely shaken that his brain completely died. He said J.J.'s brain bleeding and skull fracture were not likely caused by a short fall, but rather "[t]he only way you can get the kind of findings that we saw is if the height was one to two stories from the top of a building." According to Dr. Vardis, some of J.J.'s bleeding was due to the skull fracture and some of the bleeding was due to the shaking. He acknowledged on cross-examination that there was a disagreement between his opinion regarding J.J.'s cause of death, i.e. shaken baby syndrome, and the medical examiner's conclusion in the autopsy report, i.e. head injuries due to blunt force trauma. As for timing, Dr. Vardis noted that there is no way to tell when the injuries occurred. He stated that the injury could not have happened on Sunday, but it could have happened between five minutes to twelve hours from when the symptoms

were evident. He also expected the same physical findings if it had taken place at 1 p.m. or 5 p.m. the day J.J. came to the hospital.

The third doctor to testify at trial was Dr. Mark Witeck. Dr. Witeck, a forensic pathologist, served as the medical examiner for Brown County. He performed the autopsy on J.J. Based on his examination, Dr. Witeck concluded that J.J. died of "cranial cerebral trauma, in other words, head injuries due to blunt force trauma." Dr. Witeck testified that J.J. was just under 15 pounds and was 24.5 inches long, had no external injuries, including bruises, and his anterior fontanel, commonly referred to as the soft spot in the front of the head, was bulging outward. This was consistent with brain swelling, and the severity and global nature of the swelling was consistent with a head injury. J.J. had fractures on the right side and front base of his skull in "what's called the orbital plate, that's the little bone plate that's just above the eye." There was also a blood clot and bleeding on the surface of the right side of the brain. Dr. Witeck stated "that requires a lot of trauma to the head to get that kind of bleeding." Dr. Witeck testified J.J.'s brain bleeding was consistent with the fracture. While he stated eye hemorrhages are often seen in children who are shaken, he did not opine whether J.J. had been shaken.

According to Dr. Witeck, the fracture was consistent with having been caused by blunt force trauma. This means J.J.'s head was hit with something or against something, though there was no way to know whether it was a single blow or multiple blows. He also said J.J.'s injuries were consistent with being swung into an object with significant force. Dr. Witeck testified J.J.'s fractures were not consistent with a baby standing and falling to the floor, but were consistent

with a fall only from a large height, like off of a one- or two-story building. When asked whether a child of 24.5 inches tall sitting in a bathtub, slipping, and hitting his head on the bathtub could cause the injuries that he saw, Dr. Witeck responded, "Not at all." On cross-examination, Dr. Witeck testified a premature birth could play a part in a child's susceptibility to fracture.

Felton did not call any medical experts to testify on his behalf. (As discussed below, his attorney consulted with her physician husband and a medical student, but did not call either as witnesses at trial.) Other than the testimony elicited from the State's medical experts on cross-examination, Felton did not present any medical evidence at trial.

6. Jury Instructions, Closing Arguments, and Verdict

After the close of evidence, the trial judge instructed the jury. In part, the judge instructed, "Consider only the evidence received during this trial as given to you by these instructions, and from these alone, guided by your soundest reason and best judgment, reach your verdict." The judge also instructed, "Remarks of the attorneys are not evidence. If the remarks suggested certain facts not in evidence, disregard the suggestion. In a few moments, you will hear the closing arguments of the attorneys. Consider carefully the closing arguments of the attorneys, but their arguments and conclusions and opinions are not evidence. Draw your own conclusions from the evidence and decide upon your verdict according to the evidence and the instructions given you by the court." After instructions, the prosecutor and Felton's counsel presented their closing arguments to the jury.

During closing arguments, the prosecutor argued in part:

What House is testifying has to be the truth … what did he get for testifying on October 21st or 22nd, 2009? The answer is nothing. Absolutely nothing. Is there a case pending against him? No. Long gone. Over. Done with. There's nothing that House was going to gain by testifying. Because his case was over. It was done. Perhaps, just maybe, perhaps, he testifies because he was subpoenaed by the state and maybe, even somebody, even a criminal like Doug House, can do the right thing once in a while.

In response, Felton's counsel stated:

And by the way, I am going to set the record straight. State said, well, his case is settled. He didn't get any concessions. Cooperation with law enforcement, that matter can be reopened any time for a sentence modification. So the fact that he hasn't received any benefit yet, it might be 'cause we had to wait for this case to go forward. Doesn't mean he's not getting it. It means he hasn't gotten it yet.

And the prosecutor responded in the State's rebuttal:

Mr. House has absolutely nothing to gain here. He was honest with you. His case is closed. He can't receive anything for his testimony at this point. … [H]e won't gain anything, no advantages from the state. Just a lightening of his conscience. … And he's received no consideration for this. His case is closed. Once again, it's done.

Felton's counsel did not object to this latter statement. (Several months later, House received a sentence reduction

for his testimony at Felton's trial, though the State remained silent on that motion.) After deliberating for about four hours, the jury found Felton guilty of first degree intentional homicide. Felton was sentenced to life imprisonment.

B. Post-conviction Proceedings

Felton filed a post-conviction motion asserting ineffective assistance of counsel based on two alleged errors. First, he argued that his attorney erred by not securing medical experts to rebut the State's medical testimony at trial. Second, Felton argued his attorney erred by not objecting to the prosecutor's closing argument rebuttal statement that House would receive no benefit from his testimony.[2]

1. Felton's Counsel

The state trial court conducted a hearing on Felton's motion. There Felton's trial counsel testified. Felton was first represented by a public defender, and counsel began to represent Felton after he and his family privately retained her. While the original agreement was that she would receive $15,000 to take the case through trial, she essentially represented Felton pro-bono receiving only $750 in payments. Despite a lack of compensation, counsel continued to represent Felton because she felt strongly about his case. Financial constraints, though, impacted her decision about medical experts. Counsel testified that she did not hire medical experts because of the expense (the two out-of-state experts she contacted both wanted a minimum $2,500 retainer, and she never sought funding

---

[2] Felton also invoked the state trial court's discretionary power to grant him post-conviction relief in the interest of justice asserting the jury did not have the opportunity to hear the medical testimony and was misled by the prosecutor's closing argument statements about House.

through the state public defender's office). Counsel also stated that she did not think that "hired guns" would play well to a Green Bay jury. Instead, she researched medical literature and consulted her husband, a general internist who specialized in endocrinology, and a medical student, who was working for her husband, about the case. The medical student had relationships with physicians at Milwaukee Children's Hospital and presented J.J.'s file to one of the doctors there. That doctor said that the race of the family was the first thing at which he would look. This raised red flags for counsel, and she did not pursue an evaluation of the case from that doctor. Finally, when asked, counsel testified she was aware of *State v. Edmunds*, 746 N.W.2d 590 (Wis. 2008), in which the Wisconsin Supreme Court granted a new trial to a defendant based on newly discovered evidence rebutting the shaken baby syndrome theory. Counsel stated she did not contact any of the *Edmunds* experts.

Regarding House, counsel said she repeatedly argued to the jury why it should not believe House. She also noted she worked hard to discredit Detective Haglund, including questioning him about any concessions for House, such as checking on the surveillance of his daughter. She also explored alternate avenues from which House could have learned about the case, such as the Green Bay Police Department press release. She stated she made the strategic decision not to object to the prosecutor's closing argument rebuttal statement about House because she concluded it was better in the face of the jury not to object. Moreover, counsel noted that she "objected by giving a narration of my objection, rather than saying, objection." In other words, she described to the jury House could be entitled to a sentence modification even if he had not received one yet.

2. Post-Trial Medical Experts

Felton also called three medical experts to testify at his post-conviction hearing. These physicians were critical of the State's medical experts in two key respects: they concluded J.J.'s injuries were not from shaking and his injuries could have been the result of a short fall.

The first doctor to testify was Dr. Patrick Barnes, a pediatric radiologist and neuroradiologist from Stanford University School of Medicine. Dr. Barnes disagreed with the State's experts that J.J. had been shaken. He noted that J.J. would have suffered a neck injury if he had been shaken. Moreover, Dr. Barnes stated that even if J.J. had been shaken, his injuries would have resulted from some sort of impact and not shaking alone. He also strongly disagreed with the State's experts about J.J.'s injuries being equivalent to those of a multi-story fall. Rather, Dr. Barnes testified that J.J.'s fracture was a classic example of a fall between two and three feet, such as a child falling while being held by a standing adult. He stated, though, J.J.'s fracture and other injuries were less likely a result of a short fall, estimating a five percent chance. Dr. Barnes also testified that J.J.'s skull fracture "is what we call a linear skull fracture. It's actually a very common type of traumatic injury to an infant's skull due to accidental injury scenarios, like dropping the baby to the floor or hitting the baby's head against something, but it still doesn't tell us if it was intentional or accidental." Dr. Barnes stated it is uncommon for a child to die from a three or four foot fall. While a bump could cause a simple skull fracture, because of J.J.'s other injuries, namely the brain swelling and bleeding, something other than a bump to the head or banging his head against the wall happened according to Dr. Barnes. Regarding the bleeding

between J.J.'s brain and skull, Dr. Barnes testified that it has been reported to be connected with either a lack of oxygen or blood flow to the baby's brain or where there is malignant brain swelling from either accidental or non-accidental causes. Dr. Barnes went on to testify that J.J. had lung abnormalities suggestive of an improper intubation that could have interfered with the oxygen to his brain.

The second physician, Dr. Joseph Scheller, staff child neurologist at Children's National Medical Center in Washington, D.C., also disagreed with the State's experts that J.J. had been shaken and noted the absence of a neck injury. He said J.J. had a skull fracture, and "[i]t's physically impossible to create a skull fracture without force against the outside of the head, so we are sure that something happened to the outside of this child's head that was a force directed against it." Like Dr. Barnes, he was critical of the State's medical experts' testimony analogizing the force to that of a car accident or a multistory fall. He testified that a short fall of two or three feet would less commonly cause a skull fracture, and it was less likely to have a skull fracture from a short fall than from being swung or slammed into a hard object. Though Dr. Scheller thought that J.J.'s injuries were more in line with a fall because of the absence of bruising, he later stated it was possible to have a skull fracture without any bruising. Dr. Scheller testified, "I believe that the baby did develop the skull fracture, the brain swelling, and the retinal hemorrhages from a short fall rather than having been maliciously slammed into something" because "from witnessed short falls, that when babies get a skull fracture, it is in the parietal area … and that's where baby Felton's skull fracture was. And we really didn't see any evidence of bruising. Again, if a baby's being held violently and being slammed, then you're going to look for bruising or

bone injuries somewhere else, and we really didn't see that."
He noted a parietal fracture was a common injury in infants
and, in his experience, if the injury is not witnessed and there
is no other abnormality, the conclusion is that the injury was
accidental. As for when J.J. sustained his injuries, Dr. Scheller
testified it could have been three to six hours, maybe twelve
hours, but not twenty-four hours.

The final doctor to testify at the hearing was Dr. John Plunkett, a forensic pathologist from Minnesota. Dr. Plunkett
stated that J.J. was pretty immobile, so "we're not talking
about him rolling or falling off of some structure. We're talking about an adult either intentionally or accidentally dropping him or throwing him. Those are your possibilities, at
least from the history that I have, so you can't draw an analogy and just say fall." Put another way, Dr. Plunkett testified
that J.J.'s fracture was "consistent with an aggressive, malicious act against the baby's head and it's also consistent with
a short fall," but there was no way to tell absolutely. Similarly,
there was no way to tell just by looking at the injuries whether
they were the result of an accidental or intentional cause according to Dr. Plunkett. He stated that he would expect to see
other injuries if a child had been swung into a wall like a baseball bat. On cross-examination, Dr. Plunkett testified it was
possible, though, for a child to be propelled or struck against
an object with the same velocity and acceleration that would
result from a three-and-a-half-foot fall.

The state trial court denied Felton's post-conviction motion for relief, analyzing both the performance and prejudice
prongs of the ineffective assistance of counsel claim. The Wisconsin Court of Appeals similarly denied Felton's petition,

concluding that neither counsel's failure to object to the prosecutor's closing argument statement nor her failure to call medical experts was prejudicial. The Wisconsin Supreme Court summarily denied Felton' petition for review. Felton filed a petition for federal habeas relief in federal court. The district court denied his petition, but it issued a certificate of appealability. Felton now appeals.

## II.

To succeed on his claim of ineffective assistance of counsel, Felton must show his counsel's performance was deficient and he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We are not required to consider performance or prejudice in a particular order or even address "both components of the inquiry if [Felton] makes an insufficient showing on one." *Id.* at 697.

We review a district court's denial of a petition for habeas corpus *de novo* and findings of fact for clear error. *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005). The Antiterrorism and Effective Death Penalty Act ("AEDPA") authorizes us to grant habeas relief only if the state court decision was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in the light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). We will consider "the last reasoned opinion on the claim," which in this case is from the Wisconsin Court of Appeals. *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). A state court's application of federal law is unreasonable if it is "more than incorrect; it must have been objectively unreasonable." *Id.* at 420 (citing *Wiggins v. Smith*,

539 U.S. 510, 520 (2003)); *accord Williams v. Taylor*, 529 U.S. 362, 411 (2000). "'Unreasonable' in [the AEDPA] context means more than just incorrect; it means something … lying well outside the boundaries of permissible differences of opinion." *McGhee v. Dittmann*, 794 F.3d 761, 769 (7th Cir. 2015) (quoting *Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015)). "The bar for establishing that the state court's application of the *Strickland* [ineffective assistance of counsel] standard was 'unreasonable,' is a high one." *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006). "[A]s long as we are satisfied that the Wisconsin Court of Appeals took the constitutional standard seriously and produce[d] an answer within the range of defensible positions, we will affirm the district court's decision to deny the writ." *Id.* (citation and internal quotation omitted).

Before turning to the merits of Felton's claim, we must determine the appropriate standard of review in this case. Felton argues the Wisconsin Court of Appeals is not entitled to AEDPA deference on either the performance or prejudice prongs of *Strickland*. As for the performance prong, we agree. Because the Wisconsin Court of Appeals did not address the performance prong, we are to review counsel's performance *de novo*. *Woolley*, 702 F.3d at 422.

Regarding the prejudice prong, Felton argues that our review also should be *de novo* because the Wisconsin Court of Appeals unreasonably applied *Strickland*. *See Thomas v. Clements*, 789 F.3d 760, 767 (7th Cir. 2015) (reviewing state court's prejudice prong analysis *de novo* where the court "only used two sentences to address the prejudice prong and did not actually analyze why there was no prejudice"). First, Felton asserts the state appellate court unreasonably applied the *Strick-*

*land* prejudice standard to the facts by not "independently undertaking a complete review and analysis of the trial and postconviction expert testimony." Felton, however, did not present this argument to the district court. "[A]rguments in a federal habeas petition which were not raised in the district court are not properly raised for the first time on appeal." *Mertz v. Williams*, 771 F.3d 1035, 1043 (7th Cir. 2014). "Regardless of whether a habeas claim was fairly presented or defaulted in the state courts, if an argument was not presented to the federal district court, it is forfeited in this court." *Frazier v. Varga*, 843 F.3d 258, 262 (7th Cir. 2016). By not presenting it to the district court, Felton similarly forfeited his contention that the Wisconsin Court of Appeals unreasonably applied *Strickland* by failing to review counsel's errors cumulatively. *Id.*[3]

As he did argue before the district court, Felton contends that he is entitled to *de novo* review because the state court improperly used an outcome-determinative test in applying *Strickland*. Concluding counsel's failure to object to the prosecutor's closing argument "was not prejudicial," the Wisconsin Court of Appeals stated, "[W]e do not believe there is a reasonable probability that it affected the outcome of the trial." The Wisconsin Court of Appeals's use of the word "outcome"

---

[3] The State argues Felton did not fairly present to the state court this claim of the cumulative prejudicial effects of counsel's errors, citing *Blackmon v. Williams*, 823 F.3d 1088, 1100 (7th Cir. 2016), in which a claim was procedurally defaulted because petitioner did not raise it before the state courts. While Felton's only mention of cumulative review before the Wisconsin Court of Appeals was in a subheading of his brief stating, "Individually or cumulatively, these deficiencies prejudice Felton," we need not undertake a procedural default analysis because Felton also did not assert this argument before the district court.

does not mean it applied the outcome-determinative standard that the Supreme Court declined to adopt in *Strickland*, particularly because it is modified by no "reasonable probability." 466 U.S. at 693 (declining to adopt an outcome-determinative standard, "that counsel's deficient conduct more likely than no*t altered* the *outcome* in the case.") (emphasis added); *see Ruhl v. Hardy*, 743 F.3d 1083, 1092 (7th Cir. 2014) (summarizing that to establish ineffective assistance of counsel, a defendant must show, in part, that "there is a reasonable probability that counsel's errors *affected the outcome* of the proceeding.") (emphasis added). We are also unpersuaded by Felton's argument that the state appellate court's conclusion that "the State's case did not hinge on House's testimony" is proof it applied an outcome-determinative approach. In so stating, the Wisconsin Court of Appeals was describing House's testimony in relation to the other evidence presented at trial, including the trial evidence undermining House's credibility. In other words, the Wisconsin Court of Appeals was stating why counsel's failure to object did not "undermine confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694. This is exactly what the Wisconsin Court of Appeals was required to do to determine whether there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. Therefore, our review of the Wisconsin Court of Appeals's denial of Felton's ineffective assistance of counsel claim based on prejudice is "highly deferential." *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016) (quoting *Burt v. Titlow*, 571 U.S. 12, 18 (2013)).

Because we will review the prejudice determination of the Wisconsin Court of Appeals for whether it was unreasonable in light of the evidence presented, 28 U.S.C. § 2254(d)(2), and *Strickland*'s performance prong *de novo*, we will first consider

the prejudice prong. Only if Felton prevails on the prejudice prong will we need to consider the performance prong. *See Strickland*, 466 U.S. at 697 (noting "there is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one.").

With the standard of review decided, we turn to the prejudice prong of Felton's ineffective assistance claim. To establish prejudice, Felton must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Felton must do more than show that "it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 696). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

Felton argues his trial counsel erred in two ways: by failing to object to the prosecutor's closing argument statement regarding the availability of a sentence modification for House and by failing to call medical experts at trial. We first address counsel's failure to object to the prosecutor's closing argument. The Wisconsin Court of Appeals held counsel's failure to object to the prosecutor's statement was not prejudicial. The state appellate court noted House had credibility issues, citing his criminal history, and counsel diminished the impact of the State's statement by noting the availability of a

sentence modification in the future. We conclude that this is not an unreasonable conclusion in light of the facts.

House had a host of credibility problems, and the jury was aware of these problems. At the time of trial, House was in jail and had nine or ten prior convictions. He was known as a jailhouse lawyer, snitch, and scam artist. Moreover, as trial counsel demonstrated through the jailhouse phone calls, House was willing to reveal information he obtained while in prison to law enforcement for his own benefit and then later lie under oath about doing just that. Whether House received a benefit for his testimony at Felton's trial did not diminish House's significant credibility problems. Any objection to the prosecutor's non-evidentiary statement in closing argument rebuttal would not have altered House's testimony about Felton's confession. The jury also heard Felton's counsel's closing argument where she asserted that House did not receive any benefit *yet*. Therefore, even if counsel erred by not objecting to the prosecutor's closing argument rebuttal statement, there was not a substantial likelihood of a different result had counsel objected, *Strickland*, 466 U.S. at 696, and we conclude the Wisconsin Court of Appeals was not unreasonable in concluding that Felton was not prejudiced by counsel's failure to object, *cf. Baer v. Neal*, 879 F.3d 769, 788 (7th Cir. 2018) (When reviewing a claim of prosecutorial misconduct, "we are to consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was so inflammatory and prejudicial to the defendant … as to deprive him of a fair trial.") (internal quotations and citations omitted).

Regarding counsel's other error, Felton argues having experts to challenge the State's medical evidence "was essential

to the defense because Felton said J.J. accidentally slipped and fell in the bathtub. If experts could show the accident as a plausible cause of death, the jury could harbor reasonable doubt." In support of his claim of prejudice, Felton also asserts that his experts made two key points: first, there was no medical evidence to support a diagnosis of shaking, and second, his experts supported his claim that J.J.'s injuries were the result of a relatively minor fall.[4]

Taking the second point first, Felton's medical expert testimony does not support the theory that J.J.'s bathtub slip and fall caused his death. Those experts testified that J.J.'s injuries were consistent with a fall from two to four feet or striking something with the force of a fall from two to four feet. J.J. was 24.5 inches tall. Even if J.J. slid from the seated position and hit his head in the tub, such a fall would only have been from about one foot and would not have been a free fall, but, rather, a slide from the seated position. Therefore, there is not a reasonable probability that Felton would not have been convicted because the habeas medical testimony would not have supported the claim that J.J.'s death was caused by his bathtub fall.

Furthermore, both the trial and habeas medical experts agreed that J.J. was not mobile at the time of his death, and there was no evidence at trial that someone fell while holding J.J. To the extent that Felton's theory was that someone else

---

[4] While he argued before the district court that his post-trial experts rebutted the State's medical expert testimony regarding when J.J.'s injuries were incurred, Felton concedes on appeal that neither sides' experts could narrow the timing of the injuries to one particular suspect.

hurt J.J. at the playground, trial counsel elicited testimony from Dr. Vardis that, hypothetically, J.J.'s injuries could have been the result of a playground fall. And the jury heard testimony about Sasha bumping J.J.'s head on the door frame and medical testimony from Dr. Taylor that such a bump on the left side of the head would not have caused J.J.'s injuries. Similarly, Dr. Barnes testified at the habeas hearing that J.J.'s injuries were not the result of an accidental bump to his head.

Regarding shaking, it is true that two of the State's experts testified at trial that J.J. had been shaken, and according to Dr. Vardis, shaken severely, and that Felton's habeas experts rebutted that testimony citing the absence of a neck injury. Shaking, however, was not the only evidence the jury heard about the cause of death. Dr. Witeck testified that the cause of J.J.'s death was "head injuries due to blunt force trauma." And even Dr. Vardis testified that J.J. had been slammed into a hard object, which is consistent with the testimony of Dr. Barnes that even if J.J. had been shaken, his injuries were from some sort of impact and would not have been from shaking alone. In light of this evidence, the Wisconsin Court of Appeals was not unreasonable in its conclusion that "we are not convinced that the differences in expert medical testimony were significant enough to undermine our confidence in the outcome or prevent the real controversy from being tried".[5]

_____

[5] To the extent that Felton's argument that the state appellate court unreasonably applied *Strickland*'s prejudice standard to the facts is also an argument that the state appellate court's decision is "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," 28 U.S.C. § 2254(d), that argument is unavailing. The Wisconsin Court of Appeals was critical that Felton's citations did not support particular assertions, were only partially true, or were completely absent in support of certain claims. Because Felton's brief was required to

In support of his claim of prejudice, Felton further argues that House's testimony corroborated the State's medical testimony and, in turn, the State's medical testimony corroborated House's testimony. House's testimony, however, did not corroborate the medical evidence in the way Felton asserts in his brief. Without citation to the record, Felton repeatedly states that House testified that Felton confessed to shaking and slamming J.J. At trial, though, House never testified about shaking, but rather testified that Felton "swung [the baby] into the bathroom door." Further, the habeas medical testimony did not undermine House's testimony, and, in fact, was supported in part by Dr. Plunkett's testimony that J.J. could have been struck with the same force as a three to four foot fall. Even if the habeas medical experts had testified at trial and Felton's counsel had objected to the prosecutor's closing argument, it was not reasonably likely the jury's decision would have been different. *Strickland*, 466 U.S. at 696.

Finally, as the Wisconsin Court of Appeals noted, counsel presented evidence that others had "custody of [J.J.] on the day he was admitted to the hospital," and these alleged errors did not affect that evidence. Similarly, the unfavorable trial testimony about Felton was unaffected by these alleged errors. *Id.* (noting that some errors will not affect some of the factual findings). Felton's failure to tell anyone about J.J.'s slip

---

contain "a statement of facts relevant to the issues presented for review, with appropriate references to the record," Wis. Stat. 809.19(1)(d) and "[j]udges are not like pigs, hunting for truffles buried in the record," *Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010), the Wisconsin Court of Appeals's conclusion about a lack of prejudice was not unreasonable. *See generally United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir. 2010) ("[I]t is not this court's duty to scour without guidance a voluminous record for evidence supporting the government's theory.").

in the bathtub, including Sasha when she phoned from work or the hospital physicians, his delay in telling the police J.J. fell in the tub, testimony that he was goofing around while his son was in the NICU suffering severe brain trauma, testimony that Felton stated at the hospital that he did not want to go to jail, testimony that he had limited experience caring for J.J. by himself, and testimony he compelled his cellmate to sign a request form he had written in an attempt presumably to undermine House were all unaffected by the errors that Felton now alleges. And as we discussed above, the habeas medical testimony would not have supported Felton's claim about the cause of J.J.'s injury. Accordingly, the Wisconsin Court of Appeals did not unreasonably conclude that Felton was not prejudiced by counsel's failure to object to the prosecutor's statement and failure to call medical experts.

### III.

We AFFIRM the denial of Felton's petition for a writ of habeas corpus.