# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-4061

DAVINNE G. TAYLOR,

*Petitioner-Appellant,*

*v.*

JODY BRADLEY, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-C-127—**J.P. Stadtmueller**, *Judge.*

ARGUED MAY 11, 2005—DECIDED MAY 22, 2006

Before COFFEY, MANION and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* After a three-day trial, the jury convicted Davinne Taylor of armed robbery, Wis. Stat. §§ 943.32(1)(a) and 939.05, for an armed robbery that occurred on August 6, 1999 at Rena and Steven Lee's apartment in Milwaukee, Wisconsin. After trial, Taylor filed a post-conviction motion pursuant to Wis. Stat. § 809.30 requesting a new trial. In his motion, Taylor argued that the prosecutor's comments concerning his post-*Miranda* silence violated his right to due process and, further, that his attorney failed to provide him with effective assistance at trial. The state trial judge denied the motion, finding that the performance of his trial attorney had not prejudiced his case, and proceeded to sentence him to a term of

25 years. The trial court's decision was affirmed by the Wisconsin Court of Appeals and the Wisconsin Supreme Court denied his petition for review. Taylor next filed a petition for a writ of *habeas corpus* in federal court, and the court denied the same, finding that the alleged ineffective assistance of Taylor's trial attorney was not prejudicial to his case. Since the evidence against Taylor at trial was overwhelming, and established his guilt beyond a reasonable doubt, we affirm the denial of Taylor's petition.

## I. BACKGROUND

On August 6, 1999, Rena Lee and her son, Steven, were robbed at gunpoint in their apartment at 2326 North 45th Street in Milwaukee, Wisconsin. When the police arrived at the scene, Rena and Steven informed the investigating officers that while they were entertaining guests, a group of men forced their way into the apartment, held them at gunpoint, and departed with a number of their possessions.[1] During interviews with police, Rena and Steven identified two acquaintances, Andre Hull and a man they referred to as "Jarod," as two of the robbers. Although the police canvassed the neighborhood shortly after the robbery, they were unable to locate any suspects at that time. However, in September of 1999, while continuing their investigation, the police located and arrested Andre Hull and Davinne "Jarod" Taylor (Hull's cousin), and charged the two men with armed robbery. Prior to trial, Hull entered an *Alford* plea, which the trial judge accepted, and the case against Taylor proceeded to trial.

At trial, the prosecution's first witness was Rena Lee who testified that the robbers entered her apartment shortly

---

[1] The items allegedly stolen from the Lee's residence included a VCR, cell phone and an indeterminate amount of cash.

after 8:00 p.m. on August 6, 1999, while six people were present in the home, including herself, James Addison (her boyfriend), Steven, and three of Steven's friends. According to Rena, she was in her bedroom when the robbers entered, but when she came out, she observed her guests standing in her living room with their arms raised. She stated that there were four or five intruders, including Hull and a man she knew as "Jarod." She also testified that she knew Hull prior to the crime, as he was a friend of her other son Marvin.[2] Rena also recognized "Jarod," although at the time of the robbery, she was not aware that Jarod's given name was Davinne Taylor. At trial, Rena identified Davinne Taylor as the man known to her as Jarod.

Rena claimed that during the course of the robbery, Hull pointed a gun at Steven's neck, and Taylor told Hull to shoot him:

Q: And after you saw them with guns, what did they do at that point?

A: Andre had my son laying on the floor in front of the entertainment center with the gun pointed to his neck.

Q: And had him, you said, on the floor in front of the entertainment center with the gun pointed to his neck, correct?

A: Yes. Yes.

Q: And what was Jarod doing?

A: Oh, he was—I asked him, I asked him why he was throwing everything out.

Q: You said he was pulling stuff out of where?

---

[2] Rena also stated that she recalled Hull being a guest in her home during December of 1998.

A:  Out of my drawer in the front room.

Q:  And he was—what was he saying?

. . . .

A:  He said shoot him, they already saw my face.

After Rena completed her testimony, the prosecutor called Steven, who recounted that he was watching television with his mother when he heard banging on the downstairs door. He arose to discover the cause of the racket and observed Hull coming up the stairs, followed by Taylor.[3] Steven testified that he met Taylor through his brother approximately three years prior to the robbery, and would see him around the neighborhood on occasion.

According to Steven, shortly after the robbers entered the apartment, they forced him into his bedroom. As he was being shoved onto his bed, Steven testified that Taylor came into the room and said to an accomplice, "shoot them, they already seen [sic] my face." The threat was not carried out and the robbers continued trashing the apartment and carting out anything of value. At some point, Steven claims Hull repeatedly asked him: "[W]here the money at?", to which he replied that "there was none."

After approximately an hour of rummaging through the apartment, Steven testified that Hull and another man escorted him into the bathroom and again asked him about the location of "the money." Steven repeated his insistence that there was no money in the house, and as a result of this answer he received a punch to the face from one of the robbers he did not recognize. After he was assaulted, Taylor escorted Steven outside and ordered him to lie prone on the ground. Taylor warned him that if he was found to be

---

[3]  Like his mother, Steven also referred to Taylor as "Jarod" and identified him during trial.

harboring any cash, they would "come back again." As if to emphasize this point, Steven claims that Taylor proceeded to fire his weapon into the earth near him. According to Steven, later that night, Taylor telephoned him, identified himself as Jarod, and stated that "he didn't mean to do it" and promised that he would return Steven's belongings the next day.

The prosecution next called Detective Kirsten Webb, a nine year veteran of the Milwaukee Police Department, to the witness stand. Webb, the lead detective on the robbery investigation, recounted that when she arrived at the Lees' apartment on August 6, 1999, she observed that the living room and the two bedrooms had been ransacked with clothes and other belongings strewn about the floor. After assessing the crime scene, she obtained a statement from Steven, who told her that several men—some of whom he knew—had entered their apartment and repeatedly made clear that they were looking for money. Detective Webb then asked Steven if he knew the names of any of the men that took part in the robbery. He replied that he did, telling her that one of the men was named Andre Hull and the other was known to him only as "Jarod." Detective Webb also recalled Steven informing her that two of the perpetrators had been armed during the robbery. While Steven was giving his statement, Detective Webb observed that he had an abrasion on the left side of his face, which he stated was caused by his having been struck with a gun by one of the robbers.

Following Detective Webb's initial conversation with Steven, during which he identified Hull by name as being one of the perpetrators, she procured a picture of Hull. After viewing the picture, Steven confirmed that Hull was indeed one of the men that he had previously identified as having taken part in the armed robbery. On August 7, 1999, the day after the armed robbery, Detective Webb displayed a

photographic array to Rena Lee including a picture of Hull, and she too identified him as one of the robbers.[4] Based on this information police prepared a warrant for Hull's arrest, but while that warrant was being processed he was arrested and detained on an unrelated offense. While in police custody, Hull was questioned about the Lee robbery, and during the course of an interview with Detective Webb, he gave her the name of his cousin, Davinne "Jarod" Taylor, as having been involved. Based on Hull's statement, Webb secured a second group of mug shots from the police department's files which included a picture of Taylor. On September 16, 1999, she displayed the second array to the Lees, and, according to Detective Webb, each of them positively identified Taylor as one of the robbers.

After the prosecution rested, the defense called Sharlisha Thomas as an alibi witness. Thomas stated that she had known Taylor for three and a half years and that they had conceived a child together. She went on to recount that one evening in early August of 1999, Taylor visited her house and delivered some clothes for the baby. She could not remember the exact date of his visit, only that it was in early August of 1999. She estimated that he arrived at approximately 7:00 p.m. and that she had taken him home around 1:00 a.m. On cross-examination, the prosecutor asked Thomas if she remembered a conversation she had with Detective Webb in which she stated that Taylor had called her from the county jail and asked that she tell the police that he was with her the night of the crime. She admitted that she had spoken with Detective Webb, but was unable to recall the substance of their conversation.

---

[4] Like Rena, Steven was also shown a photographic array on August 7, 1999 and positively identified Hull as one of the perpetrators. Steven also told Detective Webb that he had known Hull prior to the armed robbery.

At the completion of Thomas's testimony, defense counsel informed the court that Taylor wished to testify. Thereafter, Taylor took the stand and his counsel asked him if he remembered what he was doing on August 6, 1999. When Taylor replied that he did, defense counsel asked him why he recalled that date. Taylor responded that the date was familiar to him because he had been released from jail just two days earlier. He went on to testify that on August 6, he spent the evening with Sharlisha Thomas and their son. According to the defendant, he went to Thomas's house to drop off some clothes for their son and stayed there from approximately 5:00 p.m. until after midnight, when she drove him home. When Taylor was asked by defense counsel if he took part in the armed robbery, he replied, "No, I did not." Defense counsel then asked Taylor if he had ever been convicted of a crime. Taylor answered that he had been convicted, once as an adult and twice as a juvenile.[5] During the prosecution's brief cross-examination, Taylor admitted that he knew Steven Lee prior to the robbery and acknowledged that Steven would recognize him if they were to encounter one another.

At the conclusion of Taylor's testimony, the prosecution recalled Detective Webb as a rebuttal witness. Detective Webb testified that, during the investigation, she received a "notice of alibi investigation request" from officers investigating Taylor's involvement in the armed robbery. Taylor's proffered alibi was that, on the night of August 6, 1999, he was with Sharlisha Thomas and could not have possibly taken part in the armed robbery. On January 8, 2000, Detective Webb interviewed Thomas, who disclosed that she had received a phone call from Taylor while he was confined in the Milwaukee County Jail. According to Thomas, Taylor told her that the police would be contacting

---

[5] Defense counsel never inquired as to the nature of his previous crimes.

her and that she should tell them that he was with her on the night of August 6th, and thus couldn't have participated in the robbery. Detective Webb also stated that Thomas did tell her that Taylor had been with her some night in "early August," but that Thomas could not remember if he was with her on the night of August 6, 1999 or some other night.

After Detective Webb completed her testimony, the court allowed the defense to recall Taylor to the witness stand. Defense counsel elicited from Taylor that he learned he was a suspect in the armed robbery on September 16, 1999, when an officer spoke with him while he was confined in the Milwaukee County House of Correction.[6] On cross-examination, the prosecutor focused on Taylor's September 16 conversation with the officer. The prosecutor asked Taylor what he said to the officer, and Taylor stated that he denied any involvement in the armed robbery. The prosecutor then asked Taylor the following three questions:

Q:  And did you tell him you were with Sharlisha, or did you just tell him you didn't have anything to do with the robbery?

A:  I told him I didn't have anything to do with the robbery because I didn't feel—

Q:  Isn't it true that you didn't tell him anything about you [sic] were with Sharlisha on August 6, 1999?

A:  No, I didn't. I didn't feel I had to because he asked me about the robbery. He didn't ask me where I was. He just asked me did I have anything to do with it.

Q:  Okay. And you didn't feel it necessary to tell him where you were at the time the robbery happened; is that correct?

---

[6]  Milwaukee County House of Correction is a component of the Milwaukee County jail system where inmates are confined when sentenced to short terms of up to one year.

A: No, because he didn't ask me that. He just asked me did I have anything to do with the robbery. That was his question. I said, No. He said, Okay.

Taylor's testimony concluded the presentation of evidence.

On June 8, 2000, the jury found Taylor guilty of armed robbery as charged. The trial judge entered a judgment of conviction and sentenced him to a term of 25 years.

Represented by another attorney, Taylor filed a post-conviction motion requesting a new trial. Taylor alleged that the prosecutor's questions concerning his post-*Miranda* silence violated his right to due process and further that he was denied his constitutional right to the effective assistance of counsel because his trial attorney: (1) failed to object to the prosecutor's questions about his silence; (2) failed to impeach the Lees' testimony with their police statements; (3) failed to object to impermissible hearsay and opinion testimony from Detective Webb; (4) committed a serious error by telling the jury during voir dire that Taylor was a convicted felon; and (5) failed to adequately prepare Taylor to testify. The trial court denied Taylor's motion on each of the issues and he appealed. On appeal, the Wisconsin Court of Appeals affirmed the decision addressing only the prejudice prong of Taylor's ineffective assistance of counsel claim. Specifically, the court held that any alleged errors by Taylor's trial counsel would not have "undermine[d] confidence in the outcome" due to the overwhelming amount of evidence produced against him. *State v. Taylor*, 2002 WI App 34, 2001 Wis. App. LEXIS 1237 at *17 (Wis. Ct. App. 2001), *cert. denied*, 2002 WI 23, 250 Wis. 2d 559, 643 N.W.2d 95 (Wis. 2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Taylor thereafter petitioned the Wisconsin Supreme Court for review, but the court refused to hear the matter. *See id.*

Having exhausted his state court remedies, Taylor filed a petition for a writ of *habeas corpus* in the United States

District Court. *See* 28 U.S.C. § 2254. Taylor argued that his trial counsel's ineffective assistance was prejudicial to his case. *See Taylor v. Bradley*, No. 03-C-127 (Sept. 17, 2004). The district court denied Taylor's petition, finding that any alleged ineffective assistance Taylor's trial counsel might have exhibited did not rise to the level of prejudice. *Id*. at *11-39. Taylor next requested that the district court issue a certificate of appealability, which the court granted on the limited question of whether trial counsel was ineffective for failing to object to the prosecutor's questions concerning Taylor's post-arrest, post-*Miranda* silence.[7]

## II. DISCUSSION

Taylor claims that his trial counsel's assistance was ineffective because he failed to object when the prosecutor questioned him about why he had not informed officers of his proffered alibi at the time of his initial interrogation. Taylor argues that his trial counsel should have objected because these questions violated the rule announced in *Doyle v. Ohio*, 426 U.S. 610 (1976), that a prosecutor cannot use a defendant's post-*Miranda* silence to impeach a defendant's exculpatory statements, and that counsel's failure to object prejudiced Taylor's case. To prevail on his ineffective assistance claim, Taylor must demonstrate that his counsel's performance fell below an objective standard of reasonableness, and that "the [alleged] deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687-88. In order to satisfy the prejudice prong, Taylor must establish that "there is a reasonable probability that, but

---

[7] Taylor also requested a certificate of appealability regarding other perceived errors made by his trial counsel. The court disagreed and concluded that Taylor had failed to make a substantial showing of the denial of a relevant constitutional right on any of the remaining issues.

for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

### A. *Standard of Review of Taylor's Ineffective Assistance Claim*

Our review of the state court's adjudication of Taylor's ineffective assistance claim is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254). Under the AEDPA, a state prisoner who petitions for a writ of *habeas corpus* must establish that the state court adjudication of his case was "contrary to, or involved an unreasonable application of, clearly-established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We agree with the Wisconsin Court of Appeals' application of *Strickland* as the correct legal standard governing Taylor's ineffective assistance claim. Accordingly, unless we were to hold that the Wisconsin Court of Appeals "unreasonably applie[d] [the *Strickland* standard] to the facts of the case," Taylor's petition for *habeas* relief must be denied. *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 1850 (2002). We review the district court's decision rejecting Taylor's *habeas* petition *de novo*. *Van Patten v. Deppisch*, 434 F.3d 1038, 1042 (7th Cir. 2006).

The bar for establishing that the state court's application of the *Strickland* standard was "unreasonable," is a high one. *Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). This court has previously stated that "'only a clear error in applying *Strickland* would support a writ of *habeas corpus*.'" *Id*. (quoting *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997)). Accordingly, as long as we are satisfied that the Wisconsin Court of Appeals "took the constitutional standard seriously and produce[d] an answer within the range of defensible positions," we will affirm the district court's decision to deny the writ. *Mendiola v. Schomig*, 224

F.3d 589, 591 (7th Cir. 2000). In assessing the state court's application of Supreme Court case law, the inquiry "is whether the determination is at least minimally consistent with the facts and circumstances of the case." *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999) (internal quotation marks and citation omitted).

## B.  *Application of the* Strickland *Test*

During the trial, the prosecutor asked Taylor what he said to the officer during his initial interrogation on September 16, 1999, and Taylor stated that he denied involvement in the armed robbery. The prosecutor then went on to pursue this line of questioning by asking Taylor whether he offered investigators an alibi during his initial interrogation. *See supra* pp. 8-9. When Taylor stated that he did not provide an alibi, the prosecution asked him why he had not. *Id*. at p. 9. Taylor argues that his trial counsel should have objected to the questions because they violated the rule that a prosecutor cannot use a defendant's exercise of his post-*Miranda* right to remain silent in an attempt to impeach a defendant's exculpatory statements at trial, *see Doyle*, 426 U.S. at 618-20, and, further, that counsel's failure to object to this line of questioning prejudiced Taylor's case. Taylor contends that there is a reasonable likelihood that if defense counsel had objected to the prosecutor's questions concerning Taylor's post-*Miranda* silence, the district judge would have agreed and, as a result, the outcome of his trial would have been different.

We need not accept Taylor's invitation to both critique his counsel's performance and determine whether he would have fared better with the jury if counsel would have objected. We agree with Taylor's assertion that, in order to be successful on an ineffective assistance claim, he must demonstrate that: (1) his counsel's performance objectively fell "outside the wide range of professionally competent

assistance"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, once a court is satisfied that a *habeas* petitioner will be unable to mount a victorious challenge under either of the two prongs of the *Strickland* test, it is unnecessary and undesirable for that court to consider the attorney performance facet of the analysis. *See id.* at 697. This is particularly true when an ineffectiveness claim may be disposed of on the basis of a lack of prejudice. *Id.* Indeed, in *Strickland*, the Supreme Court stated that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and concluded that where an ineffective assistance claim may be resolved based on lack of sufficient prejudice "that course should be followed."[8] *Id.* This court has consistently followed the Supreme Court's mandate in *Strickland*, first examining whether the petitioner has established prejudice and then, if necessary, examining whether counsel's performance fell outside the parameters of what could objectively be considered "professionally competent." *See, e.g.*, *United States v. Banks*, 405 F.3d 559, 568 (7th Cir. 2005); *United States v. Allen*, 390 F.3d 944, 951 (7th Cir. 2004); *Richardson v. United States*, 379 F.3d 485, 487-88 (7th Cir. 2004); *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003).

Nonetheless, the district court in this case, for reasons unexplained, refused to take this prudent approach. Instead, the district court began its analysis by examining

---

[8] The Supreme Court's rationale for this pronouncement was extremely perceptive; for the Court feared that relentless "grading" of defense counsel's performance by both state and federal courts might "dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Id.* at 690.

the performance of Taylor's trial counsel, even though the case could have more easily been resolved on lack of prejudice grounds. In light of the Supreme Court's guidance in *Strickland* and this court's clear precedent, proceeding directly to the prejudice prong of the inquiry would have been the more appropriate course to take. What's more, the Wisconsin Court of Appeals correctly followed this approach in Taylor's direct appeal of his conviction. *See Taylor*, 2001 Wis. App. LEXIS 1237 at *6-8. Federal review of Taylor's *habeas* claim should have been, and is, limited to determining whether the state courts' decision was reasonable in accordance with § 2254(d), as described above. Accordingly, we will not delve into Taylor's *Doyle* argument, and instead confine our analysis to whether or not Taylor was prejudiced. *Strickland*, 466 U.S. at 697 (stating that it is undesirable for courts to conduct a "second trial, this one of counsel's unsuccessful defense" when the case can be resolved on lack of prejudice grounds).

An attorney's deficient performance prejudices a defendant's case when it deprives the defendant of a fair trial, *see Fountain v. United States*, 221 F.3d 429, 434 (7th Cir. 2000), such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A trial counsel's deficient performance does not prejudice the defense when his performance might possibly have had a "conceivable effect" on the outcome of the case. *Sullivan v. Fairman*, 819 F.2d 1382, 1391 (7th Cir. 1987) (citing *Strickland*, 466 U.S. at 693). Thus, even if we were to assume *arguendo* that his attorney's performance fell below an objective standard of reasonableness under the first prong of *Strickland*, Taylor's conviction cannot be overturned unless the attorney's performance had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

*Abrahamson*, 507 U.S. 619, 623 (1993); *see also Bieghler v. McBride*, 389 F.3d 701, 707 (7th Cir. 2004) (ineffective assistance of trial counsel did not prejudice the case where overwhelming evidence pointed to the defendant's guilt); *Lieberman v. Washington*, 128 F.3d 1085, 1096 (7th Cir. 1997) (same); *United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995) (same).

The evidence presented on behalf of the state as to Taylor's guilt beyond a reasonable doubt can be most appropriately classified as overwhelming. Indeed, there was a plethora of direct evidence at trial placing Taylor at the scene of the crime. For example: (1) there were two eyewitnesses to the robbery, Steven and Rena Lee, who both testified that Taylor played an active role in the heist, repeatedly asking them for the location of "the money" and wielding a firearm; (2) when questioned by the police, Hull, Taylor's cousin, implicated Taylor in the armed robbery; (3) both Steven and Rena stated at trial that they had been previously acquainted with Taylor and, as a result, were later able to positively identify him in interviews with police shortly after the robbery and subsequently in a photographic array produced by police, leading to his arrest; and (4) Steven testified that, shortly after the armed robbery Taylor called him on the phone and apologized for his role in the heist, offering to return the stolen goods. Although the Lees' testimony evinced some minor inconsistencies, it was clear and consistent with respect to Taylor's involvement. As we recently stated in *Bieghler v. McBride*, "the jury obviously accepted [the Lees'] testimony, warts and all, and it is not our place to second-guess that assessment." 389 F.3d at 707.

What's more, Taylor failed to present any concrete evidence in his defense; that is, other than his own self-serving testimony. For example, Taylor's proffered alibi was extremely weak and unpersuasive. Although Thomas, Taylor's alibi witness, testified that she recalled being with Taylor some night in "early August" she was unable to

recall the specific date. In addition, she testified that she was the mother of Taylor's child and was only testifying because she had been subpoenaed to testify. As such, it would have been reasonable for the jury to disregard her testimony altogether. *See United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006) (stating that: "We will not upset the jury's credibility determination unless 'exceptional circumstances' exist . . . ."); *United States v. Ogle*, 425 F.3d 471, 477 n.5 (7th Cir. 2005). Also, Detective Webb testified that Thomas told her that while Taylor was in the Milwaukee County Jail, he called her and informed her he needed her to provide an alibi for him by telling the police that she had spent the night with him on August 6, 1999. At trial Thomas maintained that she did not recall having made such a statement; however, it was the jury's prerogative to weigh the testimony of Detective Webb and Thomas and decide who was telling the truth. In this case, the verdict reveals that the jury decided to believe the prosecution's witnesses over the testimony of Taylor and Thomas. *See id.*; *see also Sarkes Tarzian, Inc. v. U.S. Trust Co. of Fla. Sav. Bank*, 397 F.3d 577, 585 (7th Cir. 2005) (noting that where inherent inconsistencies in the testimony and evidence presented at trial exist "it [is] certainly within the province of the jury to parse the facts, to weigh the credibility of each witness and to disregard the testimony of witnesses it found to be less credible or not worthy of credence.")

Upon our review of the record, including the trial and appellate court orders, we are convinced that the state courts' adjudication of Taylor's claims is consistent with the facts in this case and supported by the evidence presented against Taylor. Indeed, the overwhelming amount of evidence produced against Taylor at trial doomed his ineffective assistance of counsel claim to failure. In short, he has failed to establish that, but for his trial counsel's failure to object to the prosecutor's alleged *Doyle* violation,

"there [was] a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The denial of Taylor's petition for a writ of *habeas corpus* is

AFFIRMED.

A true Copy:

      Teste:

                         _____
                         *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*