In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2965

ROSS R. THILL,

*Petitioner-Appellant,*

*v.*

REED A. RICHARDSON,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 18-cv-1005 — **James D. Peterson**, *Chief Judge.*

ARGUED APRIL 1, 2021 — DECIDED MAY 3, 2021

Before MANION, ROVNER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* A Wisconsin jury found Ross Thill guilty of sexual contact with A.M.M., his ex-girlfriend's eight-year-old daughter. At trial, A.M.M. testified that Thill had sexually assaulted her, and the prosecution presented forensic evidence corroborating her testimony—Thill's semen was found on her underwear. Thill's defense was that his jilted ex-girlfriend framed him by saving his semen for over a year, planting it on her daughter's underwear, and then coaching

her to make false accusations. While cross-examining Thill and in closing arguments, the prosecutor referenced Thill's failure to tell the police during his initial interview that he believed his ex-girlfriend had the means or motivation to frame him.

In state postconviction proceedings, Thill argued that the prosecutor impermissibly used his silence after receiving *Miranda*[1] warnings to impeach him—violating *Doyle v. Ohio*, 426 U.S. 610 (1976)—and that his trial counsel was ineffective for failing to object. The Wisconsin Court of Appeals concluded Thill had not demonstrated prejudice. Because this conclusion was not contrary to nor an unreasonable application of clearly established federal law, we affirm the district court's denial of habeas relief.

## I. Background

### A. Charges and Trial

In late 2011, Thill dated A.M.M.'s biological mother, April Gray. After they broke up, A.M.M. would occasionally stay the night at Thill's house to spend time with his two daughters. The sexual assaults allegedly occurred during these visits. The last of these visits occurred on March 8, 2013. A.M.M. claimed that Thill sexually assaulted her in his car on the way to his house. A.M.M. underwent a sexual assault exam and a forensic interview with a social worker. Shortly afterward, the state charged Thill with one count of repeated sexual assault of A.M.M. In June 2014, a four-day trial commenced.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

### 1.  The State's Case

Gray testified that she and Thill had dated for a few months near the end of 2011. When they were together, she would sometimes bring A.M.M. with her to Thill's house because Thill had two daughters around A.M.M.'s age. According to Gray, she cared more about Thill than he did about her, and so they broke up. After their breakup, A.M.M. continued to occasionally spend the night at Thill's house.

Though A.M.M. is Gray's biological daughter, her legal guardian is Gray's mother, Barbara Martin. Martin was out of town with her husband during the weekend of March 8, 2013, and Gray was taking care of A.M.M. She and Thill arranged for A.M.M. to spend the night at his house on Friday, March 8. Gray testified that the morning of March 8, as A.M.M. was getting ready to go to school, she told Gray that Thill had touched her inappropriately in the past. Gray told A.M.M. that if that were true, she would not be able to go back to Thill's house. A.M.M. began to cry and said she wanted to spend time with her friends. According to Gray, she did not believe A.M.M. at the time.

Gray testified that while A.M.M. was normally excited to go to Thill's, she seemed distressed when Thill arrived to pick her up alone and without his daughters around 5 p.m. A.M.M. packed a change of clothes and brought it with her, even though Martin had told Gray not to allow A.M.M. to pack any clothes. According to Martin, she stopped sending clothes with A.M.M. when she went to Thill's house because she would come home without them. Specifically, Martin testified that A.M.M.'s undergarments or pants would be missing. Thill would sometimes return them later in the week, after washing them.

Around 6:45 p.m., Gray received a call from Thill. He told her they were still on the road headed to his house but A.M.M. was crying and wanted to go home because she missed her grandmother. Thill put A.M.M. on the phone, and A.M.M. told Gray she wanted to come home. Shortly afterward, A.M.M. called back and said she wanted to go see Thill's daughters.

When A.M.M. arrived home the next morning, Gray testified she was acting unusual and so Gray became concerned something had happened. Martin arrived home later that night. Martin testified that she spoke with A.M.M. the next morning and A.M.M. told her that Thill had touched her. Martin then brought A.M.M. to the hospital, where she was examined by a sexual assault nurse examiner ("SANE"). At the hospital, when Gray spoke to the police, she told them that she did not believe A.M.M. because A.M.M. lies a lot.

The SANE nurse did not find any physical injuries on A.M.M. At trial, a state forensic scientist testified that semen was detected on A.M.M.'s underwear and the DNA from the semen stain matched Thill's DNA. No DNA or semen was detected on a swab of A.M.M.'s vaginal opening. Male DNA was found on a wipe of A.M.M.'s external genitalia area, but there was not enough to tell if Thill was the source.

About a week later, a social worker conducted a forensic interview with A.M.M. A videotape of the interview was played at trial in lieu of A.M.M.'s direct examination. During the interview, A.M.M. read portions of her journal to the social worker. She stated that, when they were in his car, Thill had put both his finger and his "peter" in her crotch. She told the social worker it happened in the car's front seat and Thill had taken her pants and shirt off. She further stated that the

incident in the car was not the first time it had happened, and that Thill had touched her previously in various locations in his house and car.

On cross-examination, A.M.M.'s testimony conflicted somewhat with the details she told the social worker over a year earlier. She testified, for example, the assault on March 8 took place in the car's back seat. She also stated that her shirt was on and her pants were pulled down. Defense counsel asked her about some "stories" she had told, including that her grandmother had died and that Thill's neighbor found her wandering in the woods near his house.

### 2. The Defense

Thill's defense at trial was that Gray had framed him by planting semen on A.M.M.'s underwear and coaching her to make false accusations. On Gray's cross-examination, she admitted that she had been untruthful to law enforcement officers in the past.

Thill testified in his own defense. According to Thill, when he and Gray had sex and did not use a condom, she would have him ejaculate into Tupperware-like containers near the bed. He stated that after he and Gray broke up, her behavior began to concern him. Gray would call his work and ask about him. She would also hang out in the parking lot outside his workplace and show up to his house. Thill's former boss testified that the restaurant where Thill worked from October 2011 until February 2012 would occasionally receive several calls in one night from the same number. The female caller would ask whether Thill was working. When she asked Thill about the calls, he told her it was his "crazy ex."

According to Thill, when he picked A.M.M. up on March 8, Gray tried to hug and kiss him. He then ran some errands with A.M.M. in tow. On the drive back to his house, A.M.M. began to ask him some "unusual" questions that he thought were inappropriate. He thought Gray had put her up to it. Shortly afterward, he noticed that A.M.M. was crying. He called Gray and put A.M.M. on the phone with her. He began to turn around to bring A.M.M. home, but she then changed her mind and decided to go to his house. Thill testified that the rest of the night was uneventful. A.M.M. seemed to not be getting along with his daughters. When he dropped her off the next morning, he told Gray that he no longer wanted A.M.M. to come to his house.

The defense also called an expert witness, Dr. David Thompson. He is a specialist in child clinical psychology. He testified that false memories can be planted in children. Children's memories can be shaped by external influences, like their parents. Repeated interviews can also influence what a child remembers. Dr. Thompson identified several "red flags" in the social worker's interview with A.M.M. These included that A.M.M. was relying on her journal and had difficulty reading some of the words in her journal.

### 3.  The Prosecutor's Comments

After Thill was arrested, he was taken in for an interview and read his *Miranda* rights. He then made some statements to the police about his whereabouts on March 8, 2013, and what he was doing. He told the police he had contact with A.M.M. that day and had made a phone call to Gray. Thill then invoked his right to remain silent. He did not tell the

police during that initial interview that he thought Gray was framing him for sexually assaulting A.M.M.[2]

During trial, the prosecutor referenced Thill's failure to tell the police his theory that Gray had framed him. Specifically, during his cross-examination, the following exchange occurred:

Q: Isn't it true that the first time you've told this account is today?

A: No. I've had discussions with [my attorney] before.

Q: Aagh. But when you had the opportunity to tell law enforcement these facts that you hoped would exonerate you, you did not do that?

A: No, I did not.

During closing argument, the prosecutor made the following argument:

Now, folks that are under investigation are absolutely entitled to remain silent. I must have said that to 150 clients when I was a defense attorney, you shut your mouth, I'll tell you when you can speak, and God help the ones who didn't listen to me. But if what he told you is true, wouldn't we want to know that over a year ago and not put ourselves through this process? As a result of this case, apparently the mother of [Thill's daughters] has gotten an order or some other thing that

---

[2] These facts surrounding Thill's interview with police are gleaned from the testimony at the postconviction evidentiary hearing. The transcript from the interview was entered into evidence at the hearing. It is not contained in the record here.

he can't see those two daughters. Wouldn't you have
an interest in getting your exoneration out there, but
instead we hear it for the first time from the witness
stand. Now, there are a lot of very good reasons why
that might be, but it is something that you are allowed
to consider in deciding what weight to give the defend-
ant's testimony, what weight, and that's what this is
really all about.

Thill's counsel did not object to this aspect of the state's cross-
examination or closing argument.

### 4.  Conviction and Sentencing

At the close of evidence, the state requested that the charge
be amended from repeated sexual assault of a child to re-
peated sexual contact with a child. The state also requested
that the jury be instructed on the lesser included offense of a
single count of sexual contact with A.M.M. on March 8, 2013.
The court granted both requests.

The jury acquitted Thill of repeated sexual contact with
A.M.M. It found him guilty of the lesser included offense of
one count of sexual contact occurring on March 8, 2013. The
judge sentenced him to 16 years of imprisonment followed by
9 years of extended supervision.

## B. Postconviction Proceedings

Thill filed a motion for postconviction relief, contending
that his trial counsel was ineffective for failing to object to the

prosecutor's comments on his silence.[3] The circuit court held an evidentiary hearing, at which his trial counsel testified.

Thill's trial counsel was read the relevant section of Thill's cross-examination and asked if he had considered objecting. He testified he did not recall, but that he thought the questions were "pretty close to the line" but not "over" it. He stated that "sometimes when you object and make a big deal out of a prosecutor pushing the envelope on things like that, you just draw the jury's attention to the point that the prosecutor is trying to make." He stated "that would have been a consideration that would have been in [his] head." He testified similarly about the prosecutor's closing argument, noting that it was "pushing the envelope" and "potentially improper" but he had "seen worse."

The circuit court denied Thill's postconviction motion in an oral ruling. The Wisconsin Court of Appeals affirmed. *State v. Thill ("Thill I")*, 900 N.W.2d 343 (Wis. Ct. App. 2017) (per curiam). It noted that, for Thill to succeed on his ineffective assistance of counsel claim, he had to show that his "counsel's performance was deficient and that the deficiency prejudiced" him. *Id.* ¶ 8 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The court "assume[d], without deciding, that the prosecutor's comments [on Thill's pretrial silence] were improper and that the failure to object to the comments was deficient performance." *Id.* ¶ 19.

The Wisconsin Court of Appeals determined, however, that Thill's *Strickland* claim failed because he failed "to show

---

[3] Thill also attacked other aspects of his trial counsel's performance and the trial, but those issues are not relevant to this appeal and so we will not discuss them further.

that he was prejudiced by his trial counsel's failure to object."
*Id.* ¶ 23. It explained:

> The prosecutor's questions and comments were iso-
> lated, made at the start of a lengthy and wide-ranging
> cross-examination of Thill and in the midst of a lengthy
> closing argument, at a trial that lasted three days, dur-
> ing which the parties called nineteen witnesses and
> presented forty-five exhibits. The State's evidence in-
> cluded [A.M.M.'s] forensic interview statements, her
> statements during her physical examination, her trial
> testimony, and testimony by her mother and grand-
> mother. Thill presented evidence challenging
> [A.M.M.'s] credibility, supporting his defense that
> [A.M.M.'s] mother was motivated to frame him after
> he ended their relationship, and showing his good
> character. The jury acquitted Thill of repeated acts of
> sexual assault and found him guilty of one act of sexual
> contact committed on the date of the incident de-
> scribed earlier in this opinion. In reaching that verdict,
> the jury would have been focused on the credibility of
> [A.M.M.], her mother, and her grandmother; on the
> physical evidence related to the other incidents
> charged; and also on Thill's credibility as to all the in-
> cidents charged. Thill fails to show that there is a rea-
> sonable probability that, but for his trial counsel's fail-
> ure to object to the prosecutor's brief and isolated ques-
> tions about Thill's failure to tell the detective his full
> account of one of the incidents, the verdict would have
> been different.

> This case is not like *Odell v. State*, 90 Wis. 2d 149, 151–
> 54, 279 N.W.2d 706 (1979), *on reconsideration of Odell v.*

> *State*, 87 Wis. 2d 294, 274 N.W.2d 670 (1979), which in-
> volved one incident of theft and where the questioning
> was persistent, emphatic, and expressly accusatory as
> to that one incident. We are confident that the brief and
> isolated questions and comments here did not affect
> the jury's verdict, and, therefore, that Thill suffered no
> prejudice from his counsel's failure to object.

*Id.* ¶¶ 24–25.

Thill appealed, and the Wisconsin Supreme Court denied his petition for review. Thill then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Western District of Wisconsin. The district court agreed with Thill that "the prosecutor violated *Doyle v. Ohio*, 426 U.S. 610 (1976), which holds that silence following *Miranda* warnings may not be used to impeach a defendant's testimony at trial." *Thill v. Richardson ("Thill II")*, 485 F. Supp. 3d 1018, 1021 (W.D. Wis. 2020).

Nonetheless, the district court denied Thill's habeas petition because it reasoned that he had failed to show that "the state court acted contrary to or unreasonably applied the federal standard for ineffective assistance." *Id.* Specifically, the court acknowledged that "[t]he court of appeals' decision was terse" but concluded that it "applied the correct standard and provided plausible reasons for concluding that Thill hadn't been prejudiced." *Id.* at 1022. Thill now appeals.

## II. Discussion

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant a habeas petition "if a state court's ruling on a federal constitutional question 'was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court.'" *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015) (citing 28 U.S.C. § 2254(d)(1)). "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the law set forth in [the Supreme Court's] cases." *Rhodes v. Dittmann*, 903 F.3d 646, 655 (7th Cir. 2018) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). The "unreasonable application" clause is met "'if the state court identifies the correct governing legal principle' but 'unreasonably applies that principle to the facts of the petitioner's case.'" *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)).

*Strickland* provides the clearly established federal law for Thill's ineffective assistance of counsel claim. "Under *Strickland*'s familiar two-pronged standard," Thill "must show both that his counsel's performance was deficient and that he was prejudiced as a result." *Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015). For the reasons explained below, we affirm the district court's denial of Thill's habeas petition. The state appellate court's conclusion that Thill was not prejudiced by his counsel's failure to object was neither contrary to nor an unreasonable application of *Strickland*.

Thill "is only entitled to habeas relief if he satisfies both of *Strickland*'s prongs." *Gage v. Richardson*, 978 F.3d 522, 527 (7th Cir. 2020). Given that Thill's arguments concerning the prejudice prong fail, we decline to address whether his counsel's failure to object to the prosecutor's comments on Thill's silence constituted deficient performance. *See id.* (declining to analyze deficient performance because the state appellate court "did not unreasonably apply *Strickland*'s prejudice prong"); *see also Taylor v. Bradley*, 448 F.3d 942, 949 (7th Cir. 2006) (noting that "it is unnecessary and undesirable for [a

habeas court] to consider the attorney performance facet of the analysis" when "an ineffectiveness claim may be disposed of on the basis of a lack of prejudice").

## A. Whether the Decision Was Contrary to *Strickland*

The state appellate court determined that Thill's ineffective assistance of counsel claim could not succeed because he failed to show that he was prejudiced by his counsel's failure to object. "Ordinarily, this state court determination would require us to apply AEDPA deference to the state court's decision." *Carter v. Duncan*, 819 F.3d 931, 944 (7th Cir. 2016). When a state court has reached an issue on the merits, as it did here, the question is normally not whether we "agree with the state court decision or even whether the state court decision was correct," but rather "whether the decision was unreasonably wrong under an objective standard." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc). Thill contends that we do not owe deference here because the state appellate court's decision applied the wrong standard and thus was contrary to *Strickland*. To succeed, Thill must show that the state court's decision was "'substantially different' from or 'opposite to'" the prejudice standard articulated in *Strickland*. *Allen v. Chandler*, 555 F.3d 596, 601 (7th Cir. 2009).

"In *Strickland*, the Supreme Court identified the now familiar prejudice standard as whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Duncan*, 819 F.3d at 944 (quoting *Strickland*, 466 U.S. at 694). The Court explicitly rejected an "outcome-determinative standard," and held that a defendant need not show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693.

Thill argues that the Wisconsin Court of Appeals' decision was contrary to *Strickland* because it applied an outcome-determinative standard that required him to show that the verdict would have been different had his counsel objected. This argument has no merit. The state appellate court correctly paraphrased *Strickland*'s prejudice standard when it stated that Thill had failed to show "that there is a reasonable probability that, but for his trial counsel's failure to object to the prosecutor's brief and isolated questions … the verdict would have been different." *Thill I*, 900 N.W.2d 343, ¶ 24. Two sentences later, the state appellate court noted that it was "confident that the brief and isolated questions and comments here did not affect the jury's verdict." *Id.* ¶ 25.

Even though the state appellate court correctly paraphrased *Strickland*, Thill maintains its analysis was contrary to it for two reasons. First, he argues that the court's statement that it was "confident" that the remarks "did not affect the jury's verdict" means it was applying an outcome-determinative test. But there is no indication that the state appellate court abandoned the reasonable probability standard that it articulated just two sentences earlier. Rather, the state court's phrasing suggests that it recognized that confidence in the outcome is the touchstone of the reasonable probability analysis. *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Moreover, even if it is ambiguous whether the state court's reference to "affect[ing] the jury's verdict" was correctly applying *Strickland*'s reasonable probability standard, this ambiguity is not enough to "demonstrate that the court applied a standard contrary to clearly established federal law." *See Allen*, 555 F.3d at 601 (finding that where a state court correctly referenced *Strickland* and later used a single

ambiguous metaphor, there was "no reason to think the standard [articulated was] substantially different from the *Strickland* test, nor that it is the equivalent of a 'more likely than not' standard").

Second, Thill contends that the state appellate court's perfunctory analysis of *Strickland*'s prejudice prong means that it must have been applying an outcome-determinative test. This argument conflates AEDPA's "contrary to" and "unreasonable application" clauses. The state appellate court correctly paraphrased *Strickland*'s prejudice standard and analyzed whether he adequately demonstrated that his counsel's failure to object prejudiced him. That the state court's analysis was relatively terse does not mean its decision was "contrary to" *Strickland*. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011) (noting that even "[w]here a state court's determination is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief"). Thill's argument to the contrary attempts to subvert the deference due to the state court's conclusion that he was not prejudiced.

The state court correctly paraphrased *Strickland*'s prejudice standard and nothing in its analysis suggests it used a standard "'substantially different' from or 'opposite to'" the prejudice standard articulated in *Strickland*. *Allen*, 555 F.3d at 601. Thill has failed to show that the court's decision was contrary to *Strickland*. He is therefore entitled to relief only if he can demonstrate that the state appellate court's determination that he was not prejudiced by his counsel's failure to object was unreasonable. As described below, he cannot do so.

**B. Whether the Decision Was an Unreasonable Application**
**   of *Strickland***

Thill next argues that the state appellate court's determination that he was not prejudiced by his trial counsel's failure to object was an unreasonable application of *Strickland*. "The bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one, and only a clear error in applying *Strickland* will support a writ of habeas corpus." *Allen*, 555 F.3d at 600. "A petitioner cannot prevail by showing simply that the state court's decision was wrong." *Makiel*, 782 F.3d at 896. Rather, "we ask whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Dassey*, 877 F.3d at 302 (quoting *Richter*, 562 U.S. at 103). This standard is both "difficult to meet" and "highly deferential." *Makiel*, 782 F.3d at 896 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "[F]ederal habeas relief from state convictions is rare" and "reserved for those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision-making about federal constitutional claims." *Dassey*, 877 F.3d at 302. Given this high bar, we conclude that the state appellate court did not unreasonably apply *Strickland*'s prejudice prong.

The Wisconsin Court of Appeals offered four reasons to support its conclusion that counsel's failure to object did not prejudice Thill. First, "[t]he prosecutor's questions and comments were isolated" and "made at the start of a lengthy and wide-ranging cross-examination" and "in the midst of a lengthy closing argument." *Thill I*, 900 N.W.2d 343, ¶ 24. Second, the state offered ample evidence of Thill's guilt,

including the testimony of A.M.M., Gray, and Martin. *Id.* Third, Thill had the opportunity to challenge the state's theory of the case, including "challenging [A.M.M.]'s credibility, supporting his defense that [A.M.M.]'s mother was motivated to frame him after he ended their relationship, and showing his good character." *Id.* Fourth, the jury acquitted Thill of repeated acts of sexual contact, suggesting that the jury carefully considered the credibility of the witnesses and the other evidence, including the physical evidence. *Id.* Ultimately, the state court concluded that it was "confident that the brief and isolated questions and comments here did not affect the jury's verdict." *Id.* ¶ 25.

We cannot say that this conclusion is so "lacking in justification" that fair-minded jurists could only conclude that trial counsel's failure to object prejudiced Thill. *Richter*, 562 U.S. at 103. We recognize that Thill's credibility was central to his defense, and the prosecutor's comments and questions about his silence had the potential to "plant[] in the mind of the jury the dark suspicion that [Thill] had something to hide," and that any theory of defense he "subsequently proffered [was] pure fabrication." *Alston v. Garrison*, 720 F.2d 812, 816 (4th Cir. 1983). But Thill must show more than the mere possibility that, had his trial counsel objected, the result of the proceeding would have been different. Rather, he must demonstrate that there was a reasonable probability of a different outcome, and that the state court's determination to the contrary was unreasonable. *See Gage*, 978 F.3d at 530. He has not done so.

Our decision in *Taylor* demonstrates that a state court can reasonably conclude that a defendant was not prejudiced by his trial counsel's failure to object to a *Doyle* violation, even when the credibility of the defendant is a central issue in the

case. 448 F.3d at 950–51. There, the petitioner was arrested for armed robbery after two eyewitnesses placed him at the scene. *Id.* at 943. His defense at trial was that he had an alibi— he was with his child's mother the night the robbery occurred. *Id.* During his cross-examination, the prosecutor questioned him about why he did not provide this alibi to the police. As here, Taylor alleged his counsel was ineffective because he failed to object to the prosecutor's *Doyle* violation. We found that the state court's determination that he had failed to show prejudice was reasonable. Specifically, we noted that even though the eyewitness testimony had "some minor inconsistencies," the evidence against Taylor was "overwhelming." *Id.* at 950. Further, he "failed to present any concrete evidence in his defense" except for "his own self-serving testimony," and so his alibi defense was "extremely weak and unpersuasive." *Id.*

Here, as in *Taylor*, the state court's conclusion that Thill was not prejudiced is not beyond fair-minded disagreement. The state presented significant direct evidence of the March 8 sexual assault, including A.M.M.'s account and physical evidence of Thill's semen on her underwear. Like in *Taylor*, the "minor inconsistencies" in eight-year-old A.M.M.'s forensic interview and her testimony at trial (over a year later) do not significantly undercut the weight of that evidence. 448 F.3d at 950. Further, Thill's defense that Gray planted his semen and framed him for the sexual assault had significant holes that extended far beyond his failure to raise this defense to the police. This defense was "weak and unpersuasive" and largely rested on Thill's "self-serving testimony." *Id.* It required the jury to reconcile Thill's narrative that Gray was unstable and borderline stalking him after the break-up with the fact that Thill stayed in contact with her and allowed A.M.M. to spend

the night at his house multiple times. It also required the jury to believe that Gray would have been so upset by a break-up that occurred over a year earlier that she had saved his semen and planted it in response to his decision to not have A.M.M. over to his house anymore. Lastly, Thill's defense required the jury to believe that Gray planted Thill's semen on A.M.M.'s underwear in the hopes that the sexual assault exam would uncover it while at the same time discrediting the very story that she supposedly coached her daughter to tell. (Gray testified that she told police at the hospital that she did not believe her daughter because she lies a lot.)

Thill complains that the state appellate court's reasoning was terse, but that is not enough to entitle Thill to relief. *See Dassey*, 877 F.3d at 314 (stating that the "relative brevity" of a state court's opinion "is not a reason for granting habeas relief"). In fact, state court decisions receive "significant deference even if they provide no reasons at all." *Id.* (citing *Richter*, 562 U.S. at 98–99). And here, though the state court's reasoning was terse, it focused on several key issues—including that the evidence against Thill included both eyewitness testimony and forensic evidence and that the prosecutor's statements were relatively brief. Given these points and the weaknesses in Thill's defense, the appellate court's conclusion that there was not a reasonable probability of a different outcome had his counsel objected was not "so lacking in justification that there was an error … beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 103.

### III. Conclusion

The Wisconsin Court of Appeals did not act contrary to or unreasonably apply *Strickland* when it concluded there was not a reasonable probability of a different outcome had Thill's

trial counsel objected, so the district court's denial of habeas relief is

AFFIRMED.