In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 20-2571

JAY R. THOMPSON,

*Petitioner-Appellant,*

*v.*

FRANK VANIHEL,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:16-cv-00244-JRS-MJD — **James R. Sweeney II**, *Judge.*

———————————

ARGUED APRIL 2, 2021 — DECIDED MAY 25, 2021

———————————

Before WOOD, HAMILTON, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* In 1982, an Indiana jury convicted
Jay R. Thompson of two counts of murder and one count of
conspiracy to commit burglary for his role in the home inva-
sion and killing of William and Mary Hilborn. The Indiana
Supreme Court affirmed Thompson's conviction on direct ap-
peal but vacated his death sentence; after a remand for resen-
tencing, in 1990 the Indiana Supreme Court affirmed his new
sentence of two consecutive 60-year terms for the murders

and a consecutive 30-year term for the conspiracy to commit burglary. Two years later, Thompson filed a post-conviction-relief petition in Indiana state court. For various reasons not germane to this appeal, Thompson's petition languished until 2015. Ultimately, Thompson's petition was denied, and the Indiana Court of Appeals affirmed. *See Thompson v. State*, 31 N.E.3d 1002 (Ind. Ct. App.), *transfer denied*, 34 N.E.3d 1234 (Ind. 2015). In 2016, Thompson petitioned in federal district court for a writ of habeas corpus alleging ineffective assistance of counsel. The district court dismissed Thompson's petition, holding that the Indiana state court's application of laches was an adequate and independent state-law ground upon which to deny relief. We disagreed, and remanded. *See Thompson v. Brown*, 901 F.3d 851 (7th Cir. 2018). On remand, the district court dismissed the petition because counsel's alleged errors did not prejudice Thompson. We agree with the district court, and thus affirm.

We draw the facts from the district court's thorough and careful recitation, relying also on the Indiana Supreme Court's decision from Thompson's direct appeal. *See Thompson v. State*, 492 N.E.2d 264, 267 (Ind. 1986). And we begin with the day the Hilborns were murdered in their Petersburg, Indiana home. The state's evidence at trial showed that on March 8, 1981, Thompson and Richard Dillon planned to rob the Hilborns. Sometime around 6:00 p.m., Thompson and Dillon drove Thompson's car to Petersburg, parking some distance from the Hilborn's house. They walked several blocks to the house; Thompson was armed with a folding knife, Dillon with a hunting knife. An eyewitness would later testify that he saw Dillon as he walked toward the home—Thompson had ducked behind some bushes along the sidewalk. Once at the Hilborn's door, Mr. Hilborn let Thompson and

Dillon in on the pretense that Dillon needed to use the phone. The ruse did not last long. Shortly after entering the home, Dillon pulled the hunting knife and demanded money. He then chased Mr. Hilborn into a bedroom; after Mr. Hilborn retrieved a billy club in the room, Dillon stabbed him in the stomach. At about the same time, Thompson was keeping Mrs. Hilborn from calling the police. After Dillon cut the telephone line, Mrs. Hilborn handed over what money was in her purse and in Mr. Hilborn's wallet. Money in hand, Dillon stabbed Mrs. Hilborn in the stomach and cut her throat. But Thompson and Dillon worried that the Hilborns might not be dead. Just to be sure, Thompson stabbed both with the folding knife. Thompson and Dillon then drove back to Thompson's house for Dillon to change clothes before traveling to Princeton, Indiana, to wash Dillon's bloody clothes at a laundromat. Another eyewitness testified to seeing Thompson and Dillon at the laundromat. After finishing the wash, Thompson provided $110 to buy drugs, and Thompson and Dillon went to an arcade.

A few days after the grisly murders, law enforcement's attention turned to Thompson and Dillon. On March 10, 1981, police spoke to Dillon. He admitted to being with Thompson on March 8, but said that they had not been to Petersburg that day. The following day, law enforcement approached Thompson. He told the officers a very similar story to the one Dillon had told one day earlier.

On March 12, 1981, law enforcement again asked to speak with Thompson. He agreed and drove himself to the police station, where his mother met him. (Thompson was 17 years old.) Before beginning the interview, Thompson and his mother signed a "Juvenile Warnings and Waiver Advice of

Rights," which, among other things, included the familiar *Miranda* warnings. Then questioning began. Initially, Thompson repeated the story he had told law enforcement the day before. But law enforcement had new evidence from an eyewitness that contradicted that story. One of the officers confronted Thompson with it, and another officer joined in, pressing Thompson to "tell the truth." Thompson eventually responded: "I think we better get a lawyer, mom. That's what I think." The officers continued to press Thompson, but Thompson did not say anything. Finally, after one officer asked directly whether Thompson "would talk," Thompson interjected: "Better talk to a lawyer first. That's all I've got to say." Thompson's mother added, "I guess we better [talk to a lawyer]." The officers then ended the interview and stopped the recording. But shortly after the recording ended, Thompson asked a question. The officers restarted the recording and Thompson asked, "I just wanted to know—you guys said somethin'—I just want to know. You, you say you have witness [sic] that I dropped him off; that's all I want to know. That you, is that [sic]." The officers described that a witness saw Thompson and Dillon together at the laundromat, and Thompson did not make any more substantive statements.

Around the time Thompson left the station, he consented to a search of his car. Law enforcement found his hunting knife, cleaned and oiled, in the trunk. On the same day, officers re-questioned Dillon, and he confessed to the murders and robbery. Thompson was later arrested and charged with the Hilborn murders.

At trial, the government introduced evidence tying Thompson to the murders as detailed above, some of which Dillon provided as a government witness. Thompson's March

12 interview with law enforcement was played in its entirety. Two eyewitnesses testified, one to seeing Thompson with Dillon at the laundromat in Princeton, Indiana, and another to seeing Dillon walking toward the Hilborn's home on the day of the murders. There was also testimony that Thompson jumped into the bushes as the car in which the eyewitness was riding approached. The government introduced the hunting knife law enforcement recovered from Thompson's car. Also introduced were two items of clothing recovered from Thompson's closet during a search of Thompson's home: a pair of jeans with human blood on them, and a glove with human blood "similar to" that of one of the Hilborns. And a forensic pathologist testified it was likely that two different knives were used to murder the Hilborns. The pathologist also testified that the fatal wound to Mr. Hilborn was not made by a hunting knife but by a knife like the folding knife Thompson carried, and that Mrs. Hilborn's wounds to her back were made by a knife smaller than a hunting knife.

Thompson took the stand in his defense and offered an alibi. He claimed that Dillon took his car on March 8 around 6:00 p.m. and kept it until about 7:30 p.m. During that time, Thompson said that he was at home taking a nap. Thompson explained further that when Dillon returned, he told Thompson that he was involved in a burglary. Thompson also noted that Dillon's clothes were muddy, requiring a trip to the laundromat. After making the trip, Thompson admitted to providing $110 to buy drugs, money he stated that he had saved for weeks for that purpose. No witness corroborated Thompson's alibi. Thompson also testified that he had cleaned and oiled the hunting knife at some point after the murders.

Two of the prosecutor's remarks in closing argument are the focus of Thompson's habeas petition. Both concern Thompson's March 12 interview with law enforcement:

> [The interviewing officers] say also we know Richard Dillon was seen in the laundrymat [sic] in Princeton, Indiana, washing clothes. And what does Richard Dillon do, I mean what does Jay R. Thompson do in response to that? He turns and says, "Momm [sic], I think I need a lawyer."
>
> …
>
> Two people have been murdered, but what does he come forth and say, well here's [sic] the facts? Does he say I didn't do it, I was at home sleeping, but I happen to know Richard Dillon did do it because he told me? No, he doesn't say a thing. He wants a lawyer.

Thompson's lawyer did not object to either remark.

In the district court, Thompson argued that three of counsel's decisions, each related to Thompson's statements in the March 12 interview with law enforcement, rendered counsel's assistance constitutionally ineffective: (1) counsel's failure to move pre-trial to suppress Thompson's request for a lawyer and his post-request statements; (2) counsel's failure to object to the prosecutor's remarks in closing argument referencing Thompson's request for a lawyer in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976); and (3) counsel's failure to present the

prosecutor's remarks in Thompson's direct appeal in state court. Thompson presses these three issues on appeal.[1]

The district court rejected Thompson's ineffective assistance claim and denied Thompson's petition. In short, the district court noted that the prosecutor's comments in closing "implicate[d]" *Doyle*, but held that—even if counsel's performance was deficient—there was "no reasonable probability that suppression of Mr. Thompson's statements or striking the prosecutor's arguments would have changed the trial's outcome" in light of the "overwhelming" evidence against Thompson. Preliminarily, the district court observed that Thompson made only one arguably inculpatory statement after invoking his right to counsel, asking the officers about the eyewitness who saw Thompson and Dillon together on the day of the murders. The district court then walked through the evidence of guilt it found "overwhelming": (1) the blood discovered on Thompson's jeans and gloves; (2) Thompson's admission in the March 12 interview that he was with Dillon for the entire evening on March 8; (3) Dillon's testimony at trial implicating Thompson; (4) the two different-sized stab wounds that suggested two different-sized knives were used to murder the Hilborns; (5) eyewitness testimony placing Dillon walking toward the Hilborn's home on March 8; (6) eyewitness testimony placing Thompson and Dillon at a laundromat just after the murders; and (7) the implausibility of Thompson's alibi. This appeal followed.

Thompson first raised his Sixth Amendment ineffective assistance claim in state post-conviction proceedings, but

---

[1] Thompson made other arguments to the district court but does not advance those arguments on appeal.

both parties agree that the state court did not "actually adjudicate[]" the merits of his claim. *Adorno v. Melvin*, 876 F.3d 917, 921 (7th Cir. 2017) (quotation omitted); *see* 28 U.S.C. § 2254(d).[2] As we discussed in Thompson's previous appeal, Thompson's post-conviction-relief petition was dismissed due to laches, and the Indiana Court of Appeals affirmed on that ground. *See Brown*, 901 F.3d at 853. Therefore, we assume without deciding that the Antiterrorism and Effective Death Penalty Act of 1996's (AEDPA) deferential standard of review under § 2254(d) does not apply, and we review Thompson's petition *de novo* applying the pre-AEDPA standard of 28 U.S.C. § 2243. *See Adorno*, 876 F.3d at 921.

To establish that trial or appellate counsel was constitutionally ineffective, Thompson must demonstrate: (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (noting *Strickland's* two-prong test applies to ineffective assistance claims concerning both trial and appellate counsel). And "[f]ailing to prove either" prong of *Strickland's* test "defeats a petitioner's claim." *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (quotation omitted). Because we can decide Thompson's appeal on *Strickland's* prejudice prong, as did the district court, we do not address whether counsel's performance was deficient. *See, e.g.*, *Thill v. Richardson*, — F.3d —, 2021 WL 1726824, at *5 (7th Cir. May 3, 2021).

To show prejudice, Thompson must demonstrate that "there is a reasonable probability that, but for counsel's

---

[2] The State does not argue that Thompson failed to comply with 28 U.S.C. § 2244(d)'s timeliness requirement, so we do not address the issue.

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Hicks v. Hepp*, 871 F.3d 513, 526 (7th Cir. 2017) ("To successfully advance a claim of ineffective assistance of counsel based upon the failure to file a motion to suppress, a petitioner must demonstrate … a reasonable probability that, if his confessions were suppressed, he would have been acquitted." (quotation omitted)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thompson does not have to prove that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. But he must demonstrate that the "likelihood of a different result [is] substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *see Jess*, 981 F.3d at 595. We analyze whether Thompson meets that showing "by evaluating the trial as a whole, not one slip at a time." *Cook v. Foster*, 948 F.3d 896, 901 (7th Cir. 2020).

It is not likely, much less "substantially" so, that the result of Thompson's trial or appeal would have been different but for his counsel's failure to act in the three ways Thompson identifies. Both the physical evidence and the eyewitness testimony was consistent with Dillon's testimony implicating Thompson, including the blood on Thompson's jeans and glove that law enforcement recovered from his closet shortly after the murders; the hunting knife found in Thompson's trunk, freshly cleaned and oiled; Thompson's presence with Dillon at a laundromat just after the murders; and the forensic pathologist's testimony that the stab wounds on the Hilborns were consistent with two different knives. Thompson's uncorroborated alibi was not supported by the evidence. *Cf. Taylor v. Bradley*, 448 F.3d 942, 950 (7th Cir. 2006). And Thompson's question after telling his mother that he thought they

should get a lawyer did not prejudice Thompson (and he has not argued otherwise on appeal). We agree with the district court that the evidence against Thompson was "overwhelming." Viewed as a whole, it is not substantially likely that the result of Thompson's trial would have been different but for the errors he identifies.

AFFIRMED